IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Kathleen Walters, ) | Civil Action No. 3:04-0952-JFA-JRM |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| Benedict College, ) | **REPORT AND RECOMMENDATION** |
| ) | |
| Defendant. ) | |
| ) | |

Plaintiff, Kathleen Walters ("Walters"), originally filed this case in the Court of Common Pleas for Richland County. The defendant, Benedict College ("Benedict"), removed the case to this court on March 6, 2004 because Walters' claims involve matters of federal law.[1] She alleges that her contract was not renewed due to her race and gender and in retaliation for engaging in protected activity (Claim 1);[2] that her termination was in violation of the Equal Protection Clause (Claim 2) and public policy (Claim 3); and that it breached a contract between the parties (Claim 4).

Benedict filed a motion for partial summary judgment as to Claims 2 and 4 on April 18, 2005. Walters filed a response on May 2, 2005, and Benedict filed a reply on May 12, 2005. Benedict filed a second summary judgment motion on June 25, 2005 addressing claims 1 and 3 of the complaint. Walters filed a response on July 11, 2005, and Benedict filed a reply on July 21, 2005.

---

[1] Pretrial matters in this case were automatically referred to the undersigned pursuant to Local Rule 73.02(B)(2)(g).

[2] The complaint does not list a "First Cause of Action." However, the parties have treated the allegations which precede the Second Cause of Action as the First Cause of Action.

## Standard for Summary Judgment

When no genuine issue of any material fact exists, summary judgment is appropriate. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. Id. Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir.), cert. denied, 484 U.S. 897 (1987). This does not mean that summary judgment is never appropriate in these cases. To the contrary, "'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir.

1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Id. and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995). Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits [see Fed. R. Civ. P. 56(e)], depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. Baber, citing Celotex Corp., supra. Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corporation, 12 F.3d 1310, 1316 (4th Cir. 1993) and DeLeon v. St. Joseph Hospital, Inc., 871 F.2d 1229, 1233 (4th Cir. 1989), n.7. Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Services Co., 875 F. Supp. 1115 (D.Md. 1995).

**Facts**

1. Benedict is a non-state supported historically black institution of higher learning.
2. Walters is a white female.
3. Walters was first employed by Benedict on July 1, 1999, as a Transcription Clerk. (Walters Dep., 23 and 31).
4. On March 1, 2000, she became an Administrative Specialist in the Athletic Department.
5. Walters' employment was based on a series of one year contracts which specified that Walters could be terminated without reason accompanied by appropriate notice. These contracts were from July 1 until June 30 of the following year. (Walters Dep., 31).
6. Members of the athletic Department included:

      A.      Willie Washington, Athletic Director. Walters acted as his secretary;

      B.      Gwendolyn Rouse, Senior Women's Administrator, coach of women's softball and volleyball;

      C.      Margaret Jones, Compliance Officer;

      D.      Frankie Jackson, Sports Information Director ("SID"); and

      E.      Stanley Stubbs, men's baseball coach.

7. During the course of her employment with the Athletic Department, Walters became aware of, witnessed, or participated in actions concerning student athletes which violated school policy or regulations of the National Collegiate Athletic Association ("NCAA") including typing papers, preparing papers, giving undeserved grades and raising grades.

8. On March 4, 2003, the NCAA received an e-mail from a confidential source that Benedict was violating NCAA rules (Thompson Dep., 10).

9. The NCAA telephonically contacted the confidential source on April 22, 2003. (Thompson Dep., 5).

10. Walters had a confrontation with Stubbs on April 22, 2003, concerning delivery of his paycheck. Walters reported the "assault" to campus security, but despite her persistent efforts, no action was taken against Stubbs (Walters Dep., 46-47).

11. Based on information received from the confidential source, the NCAA began a preliminary investigation by talking to six or seven of Benedict's former football coaches. They were told not to disclose the interviews by the NCAA. These interviews took place in April and May of 2003. (Thompson Dep. 6).

12.  Washington delivered a letter to Walters from Benedict's President, David Swinton, on May 30, 2003, notifying her that her contract would not be renewed. The letter stated, "(y)our last day of active employment is today, May 30, 2003, and you will be paid through June 30, 2003 your final date of employment with the College. You may consider this the thirty days notice." (Washington Dep., Ex. 1).

13.  Benedict paid Walters the full amount owed under the contract.

14.  The NCAA contacted Washington in August of 2003 and notified him of the preliminary investigation. (Thompson Dep., 12 and 44).

15.  The NCAA provided Benedict with its official Notice of Inquiry on July 1, 2004. (Thompson Dep., 10).

16.  The NCAA issued sanctions against Benedict on April 12, 2005.

## Discussion

Walters asserts Title VII claims for race and gender discrimination claims as well as retaliation (First Cause of Action) and a claim for violation of Equal Protection under §§ 1981 and 1983 (Second Cause of Action). Walters state based claims are for wrongful discharge in violation of public policy (Third Cause of Action) and Breach of Contract (Fourth Cause of Action).

A.  Race and Gender Claims

Plaintiff alleges that she was discharged (i.e., her contract was not renewed) from her position as Administrative Specialist, due to her race and sex in violation of 42 U.S.C. § 2000e-2(a). That statute provides:

> It shall be an unlawful employment practice for an employer--
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his

>   compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; . . . .

This is a disparate treatment case and plaintiff must prove that "but for" her race and sex, she would not have been terminated. <u>Holmes v. Bevilacqua</u>, 794 F.2d 142 (4th Cir. 1986). Plaintiff can prove defendant's motive to discriminate by two methods. First, the "plaintiff may meet this burden under the ordinary standards of proof by direct and indirect evidence relevant to and sufficiently probative of the issue. In the alternative, a plaintiff may resort to the judicially created scheme established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) and <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248 (1981)." <u>EEOC v. Clay Printing Company</u>, 955 F.2d 936 (4th Cir. 1992).

To overcome a motion for summary judgment, under the ordinary standards of proof, plaintiff is required to "produce direct evidence of a stated purpose to discriminate (on the basis of race and sex) and/or circumstantial evidence of a stated purpose to discriminate of sufficient probative force to reflect a genuine issue of material fact." <u>Goldberg v. B. Green and Co., Inc.</u>, 836 F.2d 845 (4th Cir. 1988). In the absence of direct or indirect proof plaintiff can employ the <u>McDonnell Douglas</u> scheme to establish a prima facie case of discrimination by offering proof that:

(1)   she is a member of a protected class;

(2)   she was discharged;

(3)   she was satisfactorily performing her duties at the time of her discharge; and

(4)   after her discharge she was replaced by someone outside the protected class.

<u>EEOC v. Clay Printing Co.</u>, at 941.

If a plaintiff establishes a prima facie case, a rebuttable presumption is created that the discharge was due to unlawful discrimination. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 504 (1993). The defendant must then come forward with a legitimate non-discriminatory explanation for its action. When the defendant does so, the presumption of discrimination evaporates, and plaintiff must prove that the defendants' proffered reason is pretextual and that the discharge was due to unlawful discrimination. Id.

The parties agree that Walters has no direct proof of discrimination and that the proper analytical framework for her race and gender claims is stated in St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993) requiring Walters to show:

>  (1)   she is a member of a protected class;
>
>  (2)   she suffered an adverse employment action;
>
>  (3)   at the time of the adverse employment action she was performing her job at a level that met her employer's legitimate expectations; and
>
>  (4)   the adverse employment action occurred under circumstances that raise an inference of race or sex discrimination.

Benedict appears to concede that Walters can establish the first three elements of her claims, but cannot establish the fourth.

1.   Race Discrimination

Walters asserts that her contract was not renewed due to her race. Walters is white. She argues that she was replaced by a black female, Verna Mayers. The primary method of establishing the fourth prong of the above test is to show replacement after termination, or in this case of non-renewal of contract, by an individual outside the protected class. King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir.), cert. denied, 540 U.S. 1073 (2003). Benedict appears to argue that

7

Walters cannot establish a prima facie case of race discrimination because she was not actually replaced as her contract was not renewed because the Athletic Department was reorganized. Benedict also offers the reorganization as a legitimate, non-discriminatory reason for its actions in its pretext analysis. (See discussion below). However, in the light most favorable to Walters, Mayers assumed most of her duties and replaced her. Therefore, the undersigned concludes that Walters has established a prima facie case of race discrimination.

    2.    Gender Discrimination

Under the above analysis, Walters was replaced by a female, Mayers. Therefore, the undersigned concludes that Walters has failed to establish a prima facie case of sex discrimination.

    3.    Pretext

Benedict argues that the decision not to renew Walters' contract was not due to her race (or gender), but was part of a reorganization of the Athletic Department. According to Washington, he recommended a reorganization of his department to David Swinton, President of Benedict, who authorized the changes (Washington Dep., 10, 15-16). The details of the reorganization and the process are sketchy, at best. The record does not contain a written proposal for reorganization or any indication of review and approval. However, the record does support a conclusion that at least a limited reorganization took place at the end of June of 2003. The contracts of Walters, as well as Stubbs and Jackson, were not renewed (Washington Dep., 14-15). The duties of Stubbs (baseball coach) and Jackson (SID) were consolidated into one position.

(Id.).³  Further, according to Washington, Walters' Administrative Assistant position was eliminated and a new position of Operations/Grant Writer was created. (Walters' Dep., 145).

Walters disputes that a new position was created and argues that Mayers was given a new title, but actually performed the same duties as plaintiff. She attempts to use the deposition testimony of Washington as his lack of knowledge of her qualifications as compared to those of Mayers as further evidence of pretext. This argument relies on portions of Washington's testimony and ignores other parts of the record.

A close reading of the record shows:

1. The plan to reorganize the Athletic Department began prior to May 30, 2003 (Washington Dep., 10; Rouse Dep., 17).

2. Washington was under pressure from Swinton to increase fund raising by the Athletic Department, including applying for and receiving grants. (Id.).

3. Washington recommended changes to Swinton who approved them. (Washington Dep., 15-16).

4. Benedict's Personnel Department developed a job description for the new position which included grant writing (Rouse Dep., 17-18).

5. Rouse served on the selection committee for the new position (Rouse Dep., 14).

6. The committee interviewed "about three" candidates for the position. (Rouse Dep., 15).

---

³Washington also testified that "over a period of time we changed some of the coaching positions also." (Washington Dep., 14). The details of any other changes are not in the record.

7.  The committee recommended that Mayers be given the position, in large part, because "she was a good writer. And that's what Coach Washington was looking for. Somebody that could basically write grants." (Rouse Dep., 16).

8.  Mayers duties included writing of grants, a task at which she has been successful (Washington Dep. 18; Rouse Dep. 18).

9.  Mayers performs some, but not all of the duties previously performed by Walters. Walters described her duties in her deposition. She testified that in addition to being Washington's assistant (typing, etc.), she did work for other coaches ("I did typing for any of the coaches' expense reports, travel…") (Walters Dep., 28).

Walters also testified that she did specific work for Rouse (Walters Dep., 29-30). Washington testified that a number of these duties were distributed within the department ("Most of the existing coaches picked up the answering of the telephones[4] and the filing of their own papers and typing their own schedules.") (Washington Dep., 16-17). Rouse specifically testified that Walters did her typing but that Mayers performed no work for her and did not assist her with her duties or responsibilities (Rouse Dep., 9).

Thus, the undersigned concludes that Mayers performed some of the duties formerly done by Walters, but a significant portion of those duties were shifted within the department. Further, Mayers assumed new duties as a grant writer.

Walters also argues that Mayers merely replaced her because Mayers was initially listed as the department's secretary on its web site. However, Mayers was also listed at a later time

---

[4]Mayers continued answering telephone calls made to the Athletic Department's main number (Washington Dep., 17).

under her new title. Given the above discussion of division of Walters' duties, this argument is without merit.

Walters has not shown that Benedict's stated reason for not renewing her contract were not the real reasons for its decision. Benedict is entitled to summary judgment on Walters' claims of race and gender discrimination.

    4.    Retaliation

    Pursuant to 42 U.S.C. § 2000e-3(a):

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees…because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

To establish a prima facie case of retaliation, it must be demonstrated that:

    (1)    the employee engaged in protected activity;

    (2)    the employer took some adverse employment action against the employee; and

    (3)    a causal connection existed between the protected activity and the adverse action.

See Von Gunten v. Maryland, 243 F.3d 858, 863 (4th Cir. 2001); Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998); Carter v. Ball, 33 F.3d at 460. If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence of a legitimate, non-discriminatory reason for the adverse action. Texas Dep't of Community Affairs v. Burdine, 450 U.S. at 254. If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual, and that his termination was motivated by discrimination.

Reeves v. Sanderson Plumbing Prods., Inc., supra; see also Duncan v. Commonwealth of Virginia Dep't of Corrs., 9 Fed. Appx. 236, 2001 WL 565672 (4th Cir. May 25, 2001)(unpublished).

An alleged protected activity may fall within § 2000e-3(a)'s "opposition clause" or its "participation clause." A different analysis is employed dependant upon which clause is implicated.

"Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." Laughlin v. Metropolitan Wash. Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998). To determine whether an employee has engaged in legitimate opposition activity, courts must "balance the purpose of [Title VII] to protect persons engaging reasonably in activities opposing…discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel." Armstrong v. Index Journal Co., 647 F.2d 441, 448 (4th Cir. 1981).

"Participation activity encompasses, as outlined in the statute, making a charge, testifying, or participating in a Title VII investigation, proceeding or hearing. Kubico v. Ogden Logistics Servs., 181 F.3d 544 (4th Cir. 1999). The reasonableness test of the opposition clause analysis is inapplicable to the consideration of a claim under the participation clause. This distinction is based on the broad statutory language ("participated in any manner") with respect to the participation clause. Kubico, 181 F.3d at 551. Further, "(a)ctivities under the participation clause are essential to the machinery set up by Title VII." Laughlin, 149 F.3d at 259 n. 4.

Walters argues that she engaged in a protected activity by opposing "an employment practice made unlawful by federal statutes." (Walters Mem., p. 7). She then specifies that "she

12

opposed Benedict failing to enforce its policies against Coach Stubbs because a white woman complained and enforcing them against others whom black victims complained." (Id.) Walters fails to cite any policy of Benedict she believes was violated or to identify any black victim who complained. She then discusses the incident involving Stubbs.

Although Walters has not made it clear, she appears to be alluding to a student, Rick Lewis, who engaged in a loud outburst during a class taught by a black teacher. According to Walters, Lewis was handcuffed and removed from the class by Campus Security. She appears to argue that Stubbs was treated differently because she (Walters) is white (Walters' Dep., 164-65).

Putting aside the obvious difference between discipline of students and faculty, nothing in the record shows that Walters ever complained to anyone on this basis. Walters reported an assault by Stubbs to Campus Security and to Rouse. She never reported the incident to Washington and never claimed that Stubbs' outburst was based on her race or gender. Walters has not established that she engaged in a protected activity.

Even if Walters could establish a prima facie case of retaliation, she cannot show pretext for the adverse employment action taken by Benedict. (See above discussion).

5.   Equal Protection

In her second cause of action, Walters alleges that Benedict violated her rights to equal protection enforceable under 42 U.S.C. § 1983.[5] Public employees may bring claims for employment discrimination under 42 U.S.C. § 1983 which states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any state or territory or the District

---

[5]Walters also lists § 1981 as a basis for her claim. However that statute relates to the formation of contracts and does not provide a remedy for violation of the Equal Protection Clause.

13

>of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof, to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Without any citation of authority or proffer of evidence, Walters asserts that Benedict is a state actor because "it receives state support and financial assistance." (Walters Mem. 4). The undersigned disagrees.

State supported colleges in South Carolina are defined by statute. These institutions are listed in S.C. Code Ann. § 59-1001-10. Benedict is not among them. To hold an institution such as Benedict responsible under § 1983, Walters must show that Benedict's actions are fairly attributable to the State of South Carolina. Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922 (1982). In Rendell-Baker v. Kohn, 457 U.S. 830 (1982), the Supreme Court held that a private school which received a large portion of its support from public funds and terminated a teacher did not meet this test because the employment decisions of the school were not influenced by state statute, regulation or policy. Id. at 831-33. Walters has not shown that Benedict's actions were fairly attributed to the State. Therefore, Benedict is entitled to summary judgment on this claim.

    6.    State Claims

Walters alleges supplemental claims asserting that the failure to renew her contract was in violation of the public policy of South Carolina (Third Cause of Action) and breached her contract with Benedict (Fourth Cause of Action).

    a.    Violation of Public Policy

Walters alleges that her discharge violated "the public policy of South Carolina." (Complaint, ¶ 23). Benedict construes this as a claim based on the holding of Ludwick

v. This Minute of Carolina, Inc., 337 S.E.2d 213 (S.C. 1985).  In Ludwick, the South Carolina Supreme Court established an exception to South Carolina's common law at-will employment doctrine.  It held that "(w)here the retaliatory discharge of an at-will employee constitutes violation of a clear mandate of public policy, a cause of action in tort for wrongful discharge arises."  Id. at 216.  Ludwick involved an at-will employee who was discharged because she chose to honor a subpoena against her employer's wishes and testify before the South Carolina Employment Security Commission.

Benedict asserts that it is entitled to summary judgment on this claim because Walters was not an at-will employee (see discussion below), and its decision not to renew her contract violated no public policy.  The undersigned agrees.

In her complaint and memorandum, Walters does not identify any public policy of South Carolina which her termination violated.  She discusses numerous events in the context of perceived violations of policies of Benedict and the NCAA.[6]  She does not argue that Benedict terminated her because she refused to violate any law.

The only case cited by Walters to support her argument is Nolte v. Gibbs International, Inc., 515 S.E.2d 101 (Ct. App. 1999).  However, this case supports the position of Benedict.  In Nolte, the plaintiff was told he was being terminated because his position was being eliminated.  The South Carolina Court of Appeals reversed the Circuit Court's grant of summary judgment finding that plaintiff had stated a claim under Ludwick and its progeny.  The Court found that there were genuine issues of material fact as to whether plaintiff was discharged in violation of a

---

[6]Walters does not identify any specific policy of Benedict or the NCAA which she believes has been violated.

clear mandate of public policy. The plaintiff alleged that he was terminated because he refused to comply with this employer's demands to file certain documents which would have constituted violations of federal law including tax fraud, mail fraud, and conspiracy.

Benedict is a private (non-public) college and violations of its policies do not implicate "public policy." For instance, Walters alleges that she reported "irregularities in class attendance" to senior athletic department staff. (Complaint, ¶ 18.F.).

Walters discusses at great length potential violations of NCAA By-Laws and asserts that her contract was not renewed because she knew of these violations. She speculates that Benedict did not want her available to talk to NCAA investigators. There is no evidence that Walters contract was not renewed because she refused to violate a law.

Even if Walters could establish that her contract was not renewed because Benedict feared that she might relate NCAA violations to the NCAA, her Ludwick claims would fail. The NCAA is a private organization (Thompson Dep., 3-4). The "NCAA, formed in 1905, is a non-profit, voluntary unincorporated association of approximately 1260 colleges, universities, athletic conferences and affiliated organizations." Pocono Invitational Sports Camp, Inc. v. National Collegiate Athletic Assoc., 317 F.Supp.2d 569, 572 (E.D.Pa. 2004). NCAA regulations do not constitute public policy.

        b.    Breach of Contract

Walters entered into an express contract with Benedict as an Administrative Specialist for a twelve-month period at a salary of $24,157. The contract expired on June 30, 2003. See "Benedict College Staff Contract," Exhibit 5 to Walter's deposition. It is undisputed that Walters was paid for the entire term of the contract.

The only case cited by Walters on this claim is <u>Small v. Springs Industries</u>, 357 S.E.2d 452 (S.C. 1987).  In that case, the Supreme Court held that employee handbook language could be considered "in deciding whether the employer and employee had a limiting agreement on the employee's **at-will employment status**, <u>Id</u>. at 455 (emphasis added).  Like the <u>Ludwick</u> decision, Small relates to South Carolina's traditional at-will employment doctrine.  Walters cites no authority that handbook language may supercede or modify the terms of an express contract between the employee and employer.  Walters argues that the express contract was not a contract, but an "appointment" leaving her an at-will employee.  The record does not support this contention.

## Conclusion

Based on a review of the record, the undersigned recommends that defendant's motions for summary judgment be granted.

                                        Respectfully submitted,

                                        s/Joseph R. McCrorey
                                        United States Magistrate Judge

February 10, 2006
Columbia, South Carolina